# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KENNETH L. ALLEN,                    )
                                     )
                Plaintiff,           )
                                     )
        v.                           )          1:21CV972
                                     )
KILOLO KIJAKAZI,                     )
Acting Commissioner of Social        )
Security,                            )
                                     )
                Defendant.           )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Kenneth L. Allen, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 10 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 15, 18; see also Docket Entry 14 (Plaintiff's Brief); Docket Entry 19 (Defendant's Memorandum); Docket Entry 20 (Plaintiff's Reply)). For the reasons that follow, the Court should enter judgment for Defendant.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 266-69), alleging a disability onset date of January 10, 2013 (see Tr. 268). Upon denial of that application initially (Tr. 119-37, 156-60) and on reconsideration

(Tr. 138-55, 162-66), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 167-68). Plaintiff, his attorney, and a vocational expert ("VE") attended the hearing. (Tr. 37-93.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 14-26.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-8, 263-65, 477-79, 480-504), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] last met the insured status requirements of the . . . Act on March 31, 2015.

2. [Plaintiff] did not engage in substantial gainful activity during the period from his alleged onset date of January 10, 2013 through his date last insured of March 31, 2015.

. . .

3. Through the date last insured, [Plaintiff] had the following severe impairments: osteoarthritis and degenerative joint disease of the bilateral knees and shoulders, status-post surgical intervention; obesity; depression anxiety disorder; and post-traumatic stress disorder.

. . .

4. Through the date last insured, [Plaintiff] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5. . . . [T]hrough the date last insured, [Plaintiff] had the residual functional capacity to perform sedentary

2

work . . . except [he] was limited to performing simple tasks that have a reasoning [development] level [("RDL")] of 1 or 2 as defined in the [Dictionary of Occupational Titles ("DOT")], and could maintain concentration, persistence and pace on such tasks for at least 2 hours at a time and complete an 8-hour workday without special supervision.  He should have no required interaction with the public and no more than occasional required interaction with co-workers.  He should work in a lower stress work environment, defined as one where he did not have to meet a rigid, inflexible production or pace requirement, make complex decisions, or adapt to frequent changes at the workstation.  He could make simple decisions, and could adapt to routine changes.  He could lift and carry up to 10 [pounds] occasionally and less than 10 [pounds] frequently, could stand and walk an aggregate of 2 hours and could sit at least 6 hours of an 8-hour workday; could no more than occasionally stoop, twist, balance, crouch, kneel and climb stairs or ramps, but could not crawl or climb ladders, ropes, or scaffolds.  He could no more than frequently reach overhead, forward, or laterally with the bilateral upper extremities.  He should have no required exposure to unprotected heights or dangerous machinery, and no concentrated exposure to extremes of humidity or heat. He needs to be allowed to change position at the workstation after 30 minutes standing or sitting.

. . .

6.  Through the date last insured, [Plaintiff] was unable to perform any past relevant work.

. . .

10.  Through the date last insured, considering [Plaintiff]'s age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [he] could have performed.
. . .

11.  [Plaintiff] has not been under a disability, as defined in the . . . Act, from January 10, 2013, the

alleged onset date, through March 31, 2015, the date last
insured.

(Tr. 19-26 (bold font and internal parenthetical citations
omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security
Commissioner's denial of social security benefits." Hines v.
Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope
of . . . review of [such a] decision . . . is extremely limited."
Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has
not established entitlement to relief under the extremely limited
review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo."
Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a
reviewing court must uphold the factual findings of the ALJ
[underlying the denial of benefits] if they are supported by
substantial evidence and were reached through application of the
correct legal standard." Hines, 453 F.3d at 561 (internal brackets
and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion.'"
Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting
Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of
more than a mere scintilla of evidence but may be somewhat less

4

than a preponderance." <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any

5

medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be expected
to last for a continuous period of not less than 12 months,'" id.
(quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the
adjudicative process, the Social Security Administration [('SSA')]
has . . . promulgated . . . detailed regulations incorporating
longstanding medical-vocational evaluation policies that take into
account a claimant's age, education, and work experience in
addition to [the claimant's] medical condition." Id. "These
regulations establish a 'sequential evaluation process' to
determine whether a claimant is disabled." Id. (internal citations
omitted).

This sequential evaluation process ("SEP") has up to five
steps: "The claimant (1) must not be engaged in 'substantial
gainful activity,' i.e., currently working; and (2) must have a
'severe' impairment that (3) meets or exceeds the 'listings' of
specified impairments, or is otherwise incapacitating to the extent
that the claimant does not possess the residual functional capacity
[('RFC')] to (4) perform [the claimant's] past work or (5) any
other work." Albright v. Commissioner of Soc. Sec. Admin., 174

_____

[1] The Act "comprises two disability benefits programs. [DIB] . . .
provides benefits to disabled persons who have contributed to the program while
employed. The Supplemental Security Income Program . . . provides benefits to
indigent disabled persons. The statutory definitions and the regulations . . .
for determining disability governing these two programs are, in all aspects
relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal
citations omitted).

6

F.3d 473, 475 n.2 (4th Cir. 1999).[2]  A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." Id. at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled. Id. at 179-80.  However, if the

---

[2] "Through the fourth step, the burden of production and proof is on the claimant.  If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[the] SSA failed to carry its burden at step 5 [of the SEP], as the job [sic] identified were not provided in response to the [hypothetical] question as identified in the ALJ [sic] decision," and "[the] jobs identified by the VE do not comply with the RFC in the written decision when considered with the [DOT] and permissible VE testimony on which the ALJ relied" (Docket Entry 14

---

[4] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

at 19 (underscoring and single-spacing omitted); <u>see also</u> Docket Entry 20 at 2-3);[5]

2) "[t]he ALJ erred [sic] his evaluation of [P]laintiff's condition under relevant rulings [Social Security Ruling 83-12, <u>Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating Exertional Limitations Within a Range of Work or Between Ranges of Work</u>, 1983 WL 31253 (1983) ("SSR 83-12"), Social Security Ruling 83-14, <u>Titles II and XVI: Capability to Do Other Work – The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Nonexertional Impairments</u>, 1983 WL 31254 (1983) ("SSR 83-14"), and Social Security Ruling 96-9p, <u>Policy Interpretation Ruling Titles II and XVI: Determining Capability to Do Other Work – Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work</u>, 1996 WL 374185 (July 2, 1996) ("SSR 96-9p")] to appropriately consider the effects of limitations beyond the limitation to sedentary work" (Docket Entry 14 at 23 (underscoring and single-spacing omitted); <u>see also</u> Docket Entry 20 at 4); and

3) "[t]he ALJ's refusal to allow [P]laintiff's counsel to complete argument and questioning of witnesses in the hearing resulted in an incomplete development of the record, and constituted an unfair and flawed hearing process" (Docket Entry 14

---

[5] Plaintiff's principal Brief in support of his instant motion contains duplicate copies of his counsel's arguments (<u>see</u> Docket Entry 14 at 1-16, 17-32.) This Recommendation will cite to the latter copy of those arguments.

9

at 28 (underscoring and single-spacing omitted); see also Docket Entry 20 at 4-5).

Defendant contends otherwise and seeks affirmance of the ALJ's decision.  (See Docket Entry 19 at 12-25.)

## 1. Step Five of the SEP

In Plaintiff's first issue on review, he maintains that "[the] SSA failed to carry its burden at step 5 [of the SEP], as the job [sic] identified were not provided in response to the [hypothetical] question as identified in the ALJ [sic] decision," as well as that "[the] jobs identified by the VE do not comply with the RFC in the written decision when considered with the [DOT] and permissible VE testimony on which the ALJ relied."  (Docket Entry 14 at 19 (underscoring and single-spacing omitted); see also Docket Entry 20 at 2-3.)  More specifically, Plaintiff points out that the ALJ's dispositive hypothetical question to the VE included no overhead reaching with the bilateral upper extremities (Docket Entry 14 at 19 (citing Tr. 85)), but that the RFC limited Plaintiff to "no more than frequent[] reach[ing] overhead" with both arms (id. (emphasis added) (citing Tr. 21)).  According to Plaintiff, "all three jobs the [ALJ] used to carry [the] SSA's burden require 'frequent' reaching overhead, forward, lateral" (id. at 20 (emphasis added) (citing id. at 33-39)), and that, although "the VE reduced job numbers [for] the [D]ocument [P]reparer job to allow for overhead reaching[, she] did not do so for [the A]ddresser or [F]inal [A]ssembler jobs" (id. at 21 (referencing Tr. 85-86)).  He

10

further contends that the RFC's limitation to frequent reaching did "not fit with the evidence." (Id. at 20; see also id. at 20-21 (detailing evidence Plaintiff believed conflicted with limitation to frequent reaching (citing Tr. 74-75, 590, 592-632, 870, 905)).)

Plaintiff additionally argues that "[t]here would be problems with [sic] jobs identified [by the VE] even had they been provided in response to an appropriate [hypothetical] question." (Docket Entry 14 at 21.) In that regard, Plaintiff notes that the Document Preparer "job does not meet [sic] requirements of the ALJ's hypothetical," because that job requires RDL 3, "as opposed to [RDL] 1 or 2, as set out in the [hypothetical]." (Id. (referencing DOT, No. 249.587-018 ("Document Preparer, Microfilming"), 1991 WL 672349 (G.P.O. 4th ed. rev. 1991) ("[RDL] 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.")).) Plaintiff also urges that, "[s]ince [he] need[ed] to stand (up to 2 hours per day)[,] reaching to desk level to do any of th[o]se jobs would produce more shoulder strain, and probably more knee and balance problems than reaching forward or laterally" (id. at 22), as well as that "[p]roblems would arise looking down from a standing position, as the[ Addresser and Final Assembler] jobs require frequent or constant near visual acuity" (id. (referencing DOT, No. 209.587-010 ("Addresser"), 1991 WL 671797 ("Near Acuity:

11

Constantly - Exists 2/3 or more of the time"), and <u>DOT</u>, No. 713.687-018 ("Final Assembler"), 1991 WL 679271 (same))). Plaintiff's contentions miss the mark.

As Plaintiff has argued (<u>see</u> Docket Entry 14 at 19), the ALJ's dispositive hypothetical question to the VE differs from the ALJ's RFC in that the hypothetical question included a limitation to "[]<u>no</u>[] reach[ing] overhead at all . . . and [] no more than frequent[] reach[ing] forward or laterally with the bilateral upper extremities" (Tr. 85 (emphasis added)), and the RFC contained a restriction to "no more than <u>frequent</u>[] reach[ing] overhead, forward, or laterally with the bilateral upper extremities" (Tr. 21 (emphasis added)). Plaintiff has failed, however, to demonstrate that such a variance prejudiced her. <u>See generally</u> <u>Fisher v. Bowen</u>, 869 F.2d 1055, 1057 (7th Cir. 1989) (observing that "[n]o principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"). As the Commissioner asserts, "[b]y any measure of common sense, a job that can be performed by someone who has *no* ability to reach overhead necessarily can also be performed by a person who has the ability to reach overhead frequently." (Docket Entry 19 at 21.) Moreover, because the ALJ ultimately found that Plaintiff remained capable of <u>frequent</u> reaching in all directions with both arms (<u>see</u> Tr. 21), no conflict exists between the RFC's limitation to

12

frequent reaching (see id.) and the DOT's characterization of those jobs as requiring frequent reaching, see DOT, No. 249.587-018 ("Document Preparer, Microfilming"), 1991 WL 672349 ("Reaching: Frequently - Exists from 1/3 to 2/3 of the time"), DOT, No. 209.587-010 ("Addresser"), 1991 WL 671797 (same), and DOT, No. 713.687-018 ("Final Assembler"), 1991 WL 679271 (same).[6]

Plaintiff's contention that the RFC's limitation to frequent reaching did "not fit with the evidence" (Docket Entry 14 at 20; see also id. at 20-21 (detailing evidence Plaintiff believed conflicted with limitation to frequent reaching (citing Tr. 74-75, 590, 592-632, 870, 905))) similarly fail. By pointing to record evidence Plaintiff believed supported greater reaching limitations, he misinterprets this Court's standard of review. The Court must determine whether substantial evidence, i.e., "more than a mere scintilla of evidence but . . . somewhat less than a preponderance," Mastro, 270 F.3d at 176 (brackets and internal quotation marks omitted), supported the ALJ's restriction to frequent reaching in all directions (see Tr. 21), and not whether other record evidence weighed against that finding, see Lanier v.

_____

[6] In response to the ALJ's hypothetical including a limitation to no overhead reaching (see Tr. 85), the VE explained to the ALJ that she "erode[d] 50 percent of [the identified 98,000 Document Preparer jobs in the national economy,] because there are some [Document Preparer] positions that [require] occasional[] reach[ing] overhead" (id. (emphasis added)). In light of the ALJ's RFC ultimately finding Plaintiff capable of frequent reaching in all directions (see Tr. 21), Plaintiff's contention that the VE erred by not providing job reduction numbers for the Addresser and Final Assembler jobs to account for the possibility that some of those jobs require occasional overhead reaching (see Docket Entry 14 at 21 (referencing Tr. 85-86)) falls short.

Colvin, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) (unpublished) ("The fact that [the p]laintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.").

Additionally, the evidence Plaintiff cited in support of his instant contentions would not have compelled the ALJ to adopt greater reaching limitations in the RFC. Plaintiff relies first on his own testimony that, since 2007, he had lacked the ability to lift his arms up over his head (Docket Entry 14 at 20 (citing Tr. 74-75)), as well as his "report[] to his psychiatrist" that he "recently had the left shoulder surgery" (id. (citing Tr. 870)). Plaintiff's reliance on his own subjective statements fails for two reasons. First, the ALJ found that "[Plaintiff]'s statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (Tr. 22), a finding that Plaintiff did not challenge (see Docket Entries 14, 20). Second, Plaintiff's counsel concedes that she could not locate "documentation" of Plaintiff's alleged left shoulder surgery (see Docket Entry 14 at 20), despite the voluminous record in this case, and the note in question does not reflect a report by Plaintiff of recent left shoulder surgery but rather that he "had an MRI of h[is] shoulder which indicate[d]

14

that he need[ed] surgery," and that "[h]is right shoulder had surgery and he did well and [wa]s hoping to [sic] same result with the left shoulder" (Tr. 870 (emphasis added)).

Plaintiff's reliance on the consultative medical examination of Dr. Stephen Burgess fares no better. In that regard, Plaintiff (A) asserts that "[Dr.] Burgess' impression included[ 'that Plaintiff] ha[d] ongoing shoulder problems, probably aggravated by use of a cane'" (id. (internal parenthetical citation omitted) (emphasis added) (quoting Tr. 589)), as well as that he "'[wa]s starting to have worsening pain in the shoulders and in fact had bursitis that had developed so severely in the left shoulder that he could not even lie down on it'" (id. (quoting Tr. 585)), and (B) notes that Dr. Burgess found Plaintiff's range of motion limited especially on the left – 85 [degrees] . . . of forward flexion" (id. (referencing Tr. 587)). Plaintiff's argument glosses over the fact that, notwithstanding Dr. Burgess's impression that Plaintiff had limited forward flexion on the left (see Tr. 587) and "ha[d] ongoing shoulder problems" (Tr. 598), Dr. Burgess ultimately opined that Plaintiff's medical conditions caused only 'mild[] impair[ment]" of Plaintiff's abilities to lift, carry, push, and pull and imposed no reaching limitation (Tr. 589). Moreover, the language regarding Plaintiff's "worsening" shoulder pain did not constitute Dr. Burgess's "impression" but rather appears in the "History of Present Illness" portion of Dr. Burgess's report, which

15

summarized Plaintiff's <u>subjective</u> symptom reporting (Tr. 585 (all-caps font omitted)), which the ALJ discounted (<u>see</u> Tr. 22) in a finding unchallenged by Plaintiff (<u>see</u> Docket Entries 14, 20).

Plaintiff additionally suggests that a Functional Capacity Evaluation ("FCE") performed on August 29, 2013, as part of his Workers' Compensation claim "precluded frequent reaching of any weight." (Docket Entry 14 at 20 (citing Tr. 905).) As the Commissioner points out, however, "Plaintiff conflates the section [of the FCE] that relays the results of testing regarding his ability to lift (*see* Tr. 905) with the examiner's conclusion about how often [Plaintiff] could reach ([*see*] Tr. 906)" (Docket Entry 19 at 17), and "the [FCE] examiner concluded that Plaintiff could reach overhead <u>frequently</u>" (<u>id.</u> (emphasis added) (citing Tr. 906)).

Plaintiff also mentions that "Dr. [J. Wayne] Keeling's notes address <u>treatment</u> for shoulder and knee problems" (Docket Entry 14 at 21 (emphasis added) (citing Tr. 592-632)), but entirely fails to point the Court to any findings in Dr. Keeling's treatment records that should have compelled the ALJ to adopt greater reaching limitations (<u>see</u> <u>id.</u>). That failure precludes relief. <u>See generally</u> <u>United States v. Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990) ("[A] litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace." (internal quotation marks omitted)); <u>Hughes v. B/E Aerospace, Inc.</u>, No. 1:12CV717, 2014 WL 906220, at *1 n.1 (M.D.N.C. Mar. 7, 2014) ("A

party should not expect a court to do the work that it elected not to do.").

With regard to Plaintiff's argument that "problems [existed] with [sic] jobs identified [by the VE] even had they been provided in response to an appropriate [hypothetical] question" (Docket Entry 14 at 21), the Commissioner concedes that the <u>DOT</u>'s characterization of the Document Preparer job as requiring RDL 3, <u>see</u> <u>DOT</u>, No. 249.587-018 ("Document Preparer, Microfilming"), 1991 WL 672349 (G.P.O. 4th ed. rev. 1991) ("[RDL] 3: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations."), conflicts with the RFC's limitation to RDL 1 or 2 (<u>see</u> Tr. 21), and "relies, instead, on the ALJ's finding that Plaintiff could perform the [A]ddresser *and* [F]inal [A]ssembler jobs, either one of which warrants affirmance" (Docket Entry 19 at 21 n.2 (emphasis supplied by the Commissioner) (citing <u>Cameron v. Chater</u>, No. 93-2311, 56 F.3d 60 (table), 1995 WL 321242, at *4 (4th Cir. May 30, 1995) (unpublished), and <u>Farnsworth v. Astrue</u>, 604 F. Supp. 2d 828, 859 (N.D.W. Va. 2009))). Thus, issue at hand narrows to whether Plaintiff has shown that the Addresser and Final Assembler jobs conflict in some way with the RFC. Plaintiff has argued that, "[s]ince [Plaintiff] need[ed] to stand (up to 2 hours per day)[,] reaching to desk level to do [either] of th[o]se jobs would produce

17

more shoulder strain, and probably more knee and balance problems than reaching forward or laterally" (id. at 22), as well as that "[p]roblems would arise looking down from a standing position, as the[ Addresser and Final Assembler] jobs require frequent or constant near visual acuity" (id. (referencing DOT, No. 209.587-010 ("Addresser"), 1991 WL 671797 ("Near Acuity: Constantly - Exists 2/3 or more of the time"), and DOT, No. 713.687-018 ("Final Assembler"), 1991 WL 679271 (same))). Those arguments should not prevail for two reasons.

First, despite having an opportunity to cross-examine the VE about these matters (which, for the reasons discussed in the context of Plaintiff's third issue on review, constituted a full and fair opportunity), Plaintiff's counsel chose not to do so (see Tr. 88-90) and therefore waived the right to raise those arguments for the first time here, see Shaibi v. Berryhill, 883 F.3d 1102, 1109 (9th Cir. 2017) ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal."); Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003) (holding the claimant's failure to raise issue before ALJ "waived [the claim] from being raised on appeal"); Stepinski v. Astrue, No. CA 11-183, 2012 WL 3866678, at *9-10 (D.R.I. Aug. 6, 2012) (unpublished) ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about

18

which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances. This [c]ourt is disinclined to provide such an incentive[ ] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)), <u>recommendation adopted</u>, 2012 WL 3863812 (D.R.I. Sept. 5, 2012) (unpublished).

Second, Plaintiff has failed to show that he lacked the ability to reach frequently to desk level or to perform constant near acuity activities. (<u>See</u> Docket Entry 14 at 22.) As discussed above, Plaintiff has pointed to no evidence that would have compelled the ALJ to adopt a limitation to less than frequent reaching (including "reaching to desk level" (<u>id.</u> at 22)). Further, Plaintiff offers <u>no</u> evidence to support his contention that he lacked the ability to engage in near acuity activities on a constant basis. (<u>See</u> <u>id.</u>; <u>see also</u> Tr. 46-80 (Plaintiff's testimony lacking any reference to vision problems), 339 (Plaintiff's Disability Report listing only "[k]nee pain (need of replacement)" and [s]houlder pain" as allegedly disabling impairments), 586 (consultative medical examiner noting 20/20 vision in right eye and 20/25 vision in left eye without correction).[7]

---

[7] Plaintiff's Reply raises <u>for the first time</u> a challenge to the VE's job numbers for the Addresser and Final Assembler occupations. (<u>See</u> Docket Entry 20 at 3 (complaining that "ALJ made no finding on whether [74,400 jobs] was a significant number" and that, "[f]or the [C]ourt to decide that [74,400 jobs] is still significant[,] would be an example of the [C]ourt substituting its judgment for that of the [ALJ]").) However, "[t]he ordinary rule in federal courts is

In short, Plaintiff's first assignment of error fails to warrant relief.

## 2. RFC

In Plaintiff's second assignment of error, he contends that "[t]he ALJ erred [sic] his evaluation of [P]laintiff's condition under relevant rulings SSR 83-12, 83-14, and 96-9p to appropriately consider the effects of limitations beyond the limitation to sedentary work." (Docket Entry 14 at 23 (underscoring and single-spacing omitted); see also Docket Entry 20 at 4.) According to Plaintiff, SSR 83-12 provides that "'if the [claimant's] exertional capacity is significantly reduced in terms of the regula[tor]y definition, it could indicate little more than the occupational base for the lower [Medical-Vocational R]ule and **could justify a finding of "Disabled'"** (Docket Entry 14 at 23 (emphasis supplied by Plaintiff) (quoting SSR 83-12, 1983 WL 31253 at *2)), and SSR 96-9p advises that "'[a]n accurate accounting of a[ claimant]'s abilities, limitations, and restrictions is necessary to determine

---

that an argument raised for the first time in a reply brief or memorandum will not be considered." Clawson v. FedEx Ground Package Sys., Inc., 451 F. Supp. 2d 731, 734 (D. Md. 2006); see also Hunt v. Nuth, 57 F.3d 1327, 1338 (4th Cir. 1995) (explaining that "courts generally will not address new arguments raised in a reply brief because it would be unfair to the [other party]"). Moreover, even if the Court considered Plaintiff's late-raised argument, it would not establish a basis for remand, as (1) the ALJ expressly found that "there were jobs that existed in significant numbers in the national economy that [Plaintiff] could perform" (Tr. 25 (emphasis added), and (2) under long-standing precedent of the United States Court of Appeals for the Fourth Circuit, such a number clearly constitutes a significant number of jobs, see Hicks v. Califano, 600 F.2d 1048, 1051 (4th Cir. 1979) ("Claimant contends that the light and sedentary jobs described by the [VE] . . . do not exist in significant numbers within the region. We do not think that the approximately 110 jobs testified to by the [VE] constitute an insignificant number." (emphasis added)).

the extent of erosion of the occupational base, the types of sedentary occupations a[ claimant] might still be able to do, **and whether it will be necessary to make use of a vocational resource'"** (id. at 24 (emphasis supplied by Plaintiff) (quoting SSR 96-9p, 1996 WL 374184, at *6)).[8] Plaintiff argues that (1) "the ALJ failed to make a finding as to whether calling a vocational resource was necessary" (id. at 23), and that (2) Plaintiff has "[s]everal exertional and non-exertional [limitations ] sufficient to erode the [sedentary] occupational base enough to mandate a finding of disability" (id. at 24; see also id. at 24 (contending that "need to alternate sitting and standing" and "need for a medically prescribed assistive device" constitute "[e]xertional factors cited in SSR 96-9p which reduce the occupational base"), 25 (maintaining that Plaintiff's "moderate limitations in all four of . . . the B criteria of the mental impairment listings" amount to "non-exertional [limitations] which can erode the sedentary work base")). Those arguments lack merit.

As an initial matter, Plaintiff's assertion that "the ALJ failed to make a finding as to whether calling a vocational resource was necessary" (Docket Entry 14 at 23) falls short. The ALJ clearly considered a vocational resource necessary in this matter, as the ALJ called on the services of a VE at the hearing to

---

[8] Although Plaintiff also attributes the latter quotation to SSR 83-14 (see Docket Entry 14 at 23), that language does not exist in that Ruling.

21

offer opinions regarding whether Plaintiff's limitations allowed him to perform any of his past relevant work and, if not, whether other jobs existed in significant numbers in the national economy that he could perform (see Tr. 81-90). As the Commissioner contends, "[t]o the extent that Plaintiff asserts that the ALJ was required to provide some preliminary analysis about whether a [VE] was necessary, Plaintiff cite[d] no legal authority for that proposition." (Docket Entry 19 at 22 (referencing Docket Entry 14 at 23).) Moreover, to the extent that Plaintiff argues that the RFC's <u>existing</u> limitations erode the sedentary occupational base to the point of mandating a finding of disability, that argument fails, because the VE testified to the contrary, i.e., that jobs existed in significant numbers that accommodated <u>all</u> of the dispositive hypothetical question's limitations (see Tr. 85-86). Furthermore, for the reasons explained more fully below, Plaintiff has not shown that the evidence should have compelled the ALJ to adopt <u>additional</u> limitations that would have further eroded the sedentary occupational base and required a finding of disability.

a. <u>Sit-Stand Option</u>

Plaintiff faults the ALJ for including in the RFC the following language: "'[Plaintiff] needs to be allowed to change positions every 30 minutes from standing to sitting.'" (Docket

22

Entry 14 at 24 (purporting to quote Tr. 21).)[9]   According to
Plaintiff, "[t]his is where more specificity, as required in [SSR
96-9p], would be helpful," because "2 hours standing would mean
more than 30 minutes sitting at a time."  (Id.)

SSR 96-9p provides as follows regarding the impact of
sit/stand options on the sedentary occupational base:

> **Alternate sitting and standing:** An individual may need to
> alternate the required sitting of sedentary work by
> standing (and, possibly, walking) periodically.  Where
> this need cannot be accommodated by scheduled breaks and
> a lunch period, the occupational base for a full range of
> unskilled sedentary work will be eroded.  The extent of
> the erosion will depend on the facts in the case record,
> such as the frequency of the need to alternate sitting
> and standing and the length of time needed to stand.  The
> RFC assessment must be specific as to the frequency of
> the individual's need to alternate sitting and standing.
> It may be especially useful in these situations to
> consult a vocational resource in order to determine
> whether the individual is able to make an adjustment to
> other work.

SSR 96-9p, 374185, at *7 (underscoring added).  Here, the ALJ
included in the dispositive hypothetical question to the VE a
"limitation . . . that the individual needs a sit/stand option
after 30 minutes of sitting or 30 minutes of standing to change
position" (Tr. 86 (emphasis added)), and included an "allow[ance]
to change position at the workstation after 30 minutes standing or
sitting" in the RFC (Tr. 21 (emphasis added)).  The ALJ thus
satisfied SSR 96-9p's requirement that "[t]he RFC assessment [] be

---

[9] The ALJ's RFC contains no such language (see Tr. 21); rather, the RFC
includes an "allow[ance] to change position at the workstation after 30 minutes
standing or sitting" (id. (emphasis added)).

specific as to the frequency of the individual's need to alternate sitting and standing," SSR 96-9p, 374185, at *7 (emphasis added). Moreover, in response to the hypothetical including the sit/stand option, the VE identified two jobs, Addresser and Final Assembler, which accommodated all of the hypothetical's limitations. (See Tr. 86.) Thus, the ALJ also followed SSR 96-9p's admonition that deemed VEs "especially useful" to determine the impact of a sit/stand option on the sedentary occupational base, SSR 96-9p, 374185, at *7.[10]

---

[10] Plaintiff added the following argument in his Reply regarding the sit/stand option:

> This 30-minute alternating sit/stand requirement raises obvious questions. Jobs identified by the VE require working on a surface with multiple objects; the [A]ddresser and [F]inal [A]ssembler jobs dealing with volumes of mail and/or tiny parts. If the surface is not movable, even a worker who is limited to frequent reaching probably cannot reach frequently from standing to desk height without aggravating shoulder damage. If the worker is not accommodated with an adjustable surface, how long does it take [P]laintiff to stand? To adjust materials? What if he can't make [sic] 30-minute deadline? Can he hold on while standing? Can the surface support his 300 [pound] weight if he loses balance while standing?

(Docket Entry 20 at 4.) Again, notwithstanding a full and fair opportunity to cross-examine the VE about these matters, Plaintiff's counsel opted against doing so (see Tr. 88-90) and therefore waived the right to raise those arguments for the first time here, see Shaibi, 883 F.3d at 1109 ("[A]t least when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal."); Anderson, 344 F.3d at 814 (holding the claimant's failure to raise issue before ALJ "waived [the claim] from being raised on appeal"); Stepinski, 2012 WL 3866678, at *9-10 ("The [c]ourt views unfavorably the silence of [the p]laintiff's counsel at the hearing regarding the omission about which he now complains. Reversal and remand . . . would encourage other counsel to remain silent in similar circumstances. This [c]ourt is disinclined to provide such an incentive[] . . . [and] finds that [the p]laintiff waived this issue by failing to raise it before the ALJ." (internal citations omitted)).

24

b.  Cane

Plaintiff asserts that his "need for a medically prescribed assistive device" constitutes an "[e]xertional factor[] cited in SSR 96-9p which reduce[d] the occupational base." (Docket Entry 14 at 24 (referencing SSR 96-9p, 1996 WL 374185, at *7).) In support of his need for a cane, Plaintiff points to (1) the fact that he brought his cane to the hearing (id.), (2) Dr. Burgess's report which, "taken in context, appeared to assume that [P]laintiff did need to use a cane though, as he demonstrated in the exam, he could take some steps without it" (id. (referencing Tr. 586)), and (3) Dr. Keeling's "prescri[ption of] a cane" (id. at 25 (citing Tr. 513)). In addition, Plaintiff identifies his "problems with falls" as "another possible cause of erosion of the sedentary work base." (Id. at 27 (citing Tr. 73-74).)

"To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information)." SSR 96-9p, 1996 WL 374185, at *7 (emphasis added). Moreover, "the legal issue does not turn on whether a cane was 'prescribed' . . . but whether a cane was 'medically required.'" Spaulding v. Astrue, 379 F. App'x 776, 780 (10th Cir. 2010). The ALJ here relied upon Dr. Burgess's

25

report to find that Plaintiff "did not need a cane." (Tr. 23 (referencing Tr. 586).) For the reasons that follow, the ALJ did not err in that regard.

As the Commissioner argues, "the fact that Plaintiff brought a cane . . . to a disability hearing five years after his date last insured does not advance his claim, as he still lacks the medical documentation necessary for the ALJ to find that use of that cane was medically necessary." (Docket Entry 19 at 18-19 (internal parenthetical citation and comma omitted).) Furthermore, and contrary to Plaintiff's assertions, Dr. Burgess did not "assume that [P]laintiff did need to use a cane though, as he demonstrated in the exam, he could take some steps without it." (Docket Entry 14 at 24 (referencing Tr. 586).) Rather, Dr. Burgess offered the following observations:

> GENERAL: [Plaintiff] is well developed and well nourished. [He] ambulates with a very antalgic gait favoring the right leg. He has a prescription cane <u>but does not require it</u>. The limp is more pronounced without the cane. The gait is not otherwise lurching or unpredictable. <u>The gait is not particularly unsteady</u>.

(Tr. 586 (emphasis added).) Dr. Burgess thereafter found that the "sum" of Plaintiff's medical conditions caused "mild[] impair[ment] in his "ability to perform work-related activities" but did not include a requirement for a cane or other hand-held assistive device. (Tr. 589.) Plaintiff has failed to explain how that report, "taken in context" (Docket Entry 14 at 24), means anything other than that Dr. Burgess did not believe Plaintiff's impairments

26

necessitated a cane. With regard to Dr. Keeling, on <u>one</u> occasion, after observing Plaintiff "walking oddly, more on his tip toes," Dr. Keeling suggested that Plaintiff "get a crutch or a cane to shift his weight properly." (Tr. 513.) Dr. Keeling neither prescribed a cane, nor opined that a cane constituted a medical necessity. (<u>See</u> <u>id.</u>) None of Dr. Keeling's other treatment records reference Plaintiff's use of a cane. (<u>See</u> Tr. 510-12, 517-84, 592-632, 1067-80.) Plaintiff's related reliance on his "problems with falls" as "another possible cause of erosion of the sedentary work base" (Docket Entry 14 at 27 (citing Tr. 73-74)) similarly falls short, as it relies <u>entirely</u> on Plaintiff's subjective report at the hearing of such falls and, as discussed above, the ALJ discounted Plaintiff's subjective symptom reporting (<u>see</u> Tr. 22), a finding Plaintiff did not contest (<u>see</u> Docket Entries 14, 20).

c. <u>Mental Limitations</u>

Plaintiff offers the following contentions regarding additional mental limitations he believes the ALJ should have included in the RFC (and dispositive hypothetical question) that would have further eroded the sedentary occupational base:

> Mental limitations are appropriate to address in this case.
>
>> A substantial loss of ability to meet any one of several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule), **will substantially erode** the unskilled sedentary

> occupational base and would justify a finding
> of disability.  These mental activities are
> generally required by competitive,
> remunerative, unskilled work:
>
> • Understanding, remembering, and carrying
>   out simple instructions.
> • Making judgments that are commensurate
>   with the functions of unskilled
>   work--i.e., simple work-related
>   decisions.
> • Responding appropriately to supervision,
>   co-workers and usual work situations.
> • Dealing with changes in a routine work
>   setting.
>
> The ALJ found [P]laintiff to have moderate limitations in
> all four of these areas, which are the B criteria of the
> mental impairment listings.  He also stated in accurate
> if somewhat understated comments that "[Plaintiff] is
> noted to isolate by several sources" and "due to
> [Plaintiff]'s tendency to socially isolate, he is limited
> in his interactions with others."  The latter, at a
> minimum, would appear to impose significant limitations
> on responding appropriately to supervision, co-workers,
> and usual work situations.

(Docket Entry 14 at 25 (emphasis added) (internal parenthetical

citations omitted) (quoting, in turn, SSR 96-9p, 1996 WL 374185, at

*9, and Tr. 22).)  Plaintiff additionally challenges the ALJ's

observation that "[t]here [wa]s . . . little mental health

evidence . . . prior to the date last insured" (Tr. 22), arguing

that, "[i]n fact, there [wa]s considerable evidence relating to the

period through the date last insured . . . which the ALJ failed to

acknowledge."  (Docket Entry 14 at 26; see also id. at 26-27

(describing such evidence (citing Tr. 591, 633-36, 870, 883, and

referencing Tr. 873-77)).)

28

To begin, Plaintiff never identifies what "significant limitations on responding appropriately to supervision, co-workers, and usual work situations" the ALJ should have included in the RFC and hypothetical question. (Id. at 25.) The RFC already included limitations to "simple tasks" rated at "[RDL ] 1 or 2," "no required interaction with the public and no more than occasional required interaction with co-workers," and "a lower stress work environment, defined as one where [Plaintiff] did not have to meet a rigid, inflexible production or pace requirement, make complex decisions, or adapt to frequent changes." (Tr. 22 (emphasis added); see also Tr. 82-85 (hypothetical questions containing materially similar restrictions).) Plaintiff does not explain how those significant restrictions in the RFC fail to accommodate Plaintiff's moderate limitations in understanding, remembering, or applying information, interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing oneself (see Tr. 20). (See Docket Entry 14 at 25-26.)[11]

---

[11] The DOT codes for Addresser and Final Assembler – DOT, No. 209.5**8**7-010 ("Addresser"), 1991 WL 671797, DOT, No. 713.6**8**7-018 ("Final Assembler"), 1991 WL 679271, contain a fifth digit, or 'People' rating, of "8," "reflecting the lowest possible level of human interaction that exists in the labor force," Fletcher v. Colvin, No. 1:15CV166, 2016 WL 915196, at *10 (M.D.N.C. Mar. 4, 2016) (unpublished), recommendation adopted, slip op. (M.D.N.C. Mar. 28, 2016) (Osteen, C.J.). Moreover, those jobs rate the activity of "Taking Instructions – Helping" as "Not Significant" and reflect the tasks of "Talking" and "Hearing" as "Not Present - Activity or condition does not exist." DOT, No. 209.587-010 ("Addresser"), 1991 WL 671797, DOT, No. 713.687-018 ("Final Assembler"), 1991 WL 679271. Consequently, Plaintiff has not shown that remand for the ALJ to include greater social interaction limitations in the RFC would result in a different outcome in his case. See Ridley G. v. Commissioner of Soc. Sec., No. 1:20CV773, 2021 WL 4307507, at *8, *13 (N.D.N.Y. Sept. 22, 2021) (unpublished) (deciding that RFC restriction to no interaction or tandem tasks with coworkers harmonizes with jobs with DOT level 8 interaction); Scott C. v. Commissioner of Soc. Sec.,

Nor should the Court order any relief based on Plaintiff's assertion that "considerable evidence [exists] relating to the period through the date last insured . . . which the ALJ failed to acknowledge" (Docket Entry 14 at 26; see also id. at 26-27 (describing such evidence (citing Tr. 591, 633-36, 870, 883, and referencing Tr. 873-77))). In that regard, the ALJ provided the following analysis of Plaintiff's mental health treatment:

> [Plaintiff] attended counselling [sic] for post-traumatic stress disorder and major depressive disorder. [(Tr. 591)]. There appear to have been some difficulties obtaining the correct medication dosage; however, the record does not show suicidal ideations or inpatient hospital visits. [Plaintiff] has been noted to isolate by several sources (see, for example [(Tr. 472)]. There is evidence that he saw a therapist before his date last insured, and the therapist referred him to Deborah Ross, MD. See [(Tr. 888)]. He had previously been incarcerated, and spent time in drug rehabilitation.
>
> There is, however, little mental health evidence beyond the above prior to the date last insured. Overall, it shows an individual struggling to cope with difficulties due to depression and anxiety. Limitations to simple, routine tasks are appropriate, as are limitations to concentration, persistence, and maintaining pace. Due to [Plaintiff]'s tendency to socially isolate, he is limited in his interactions with others.

---

No. 2:20CV109, 2021 WL 2682276, at *4-5 (D. Vt. June 30, 2021) (unpublished) ("'[L]evel 8 interaction [in the DOT] is compatible with an RFC limiting a claimant to only superficial contact with coworkers, supervisors, and the public.'" (quoting Alie v. Berryhill, No. 4:16CV1352, 2017 WL 2572287, at *16 (E.D. Mo. June 14, 2017) (unpublished)) (emphasis added)); Wilson v. Saul, No. 1:19CV1089, 2020 WL 6293132, at *4 (M.D.N.C. Oct. 27, 2020) (unpublished) (Webster, M.J.) ("[E]ven assuming the ALJ erred here by failing to include additional social limitations in the RFC . . ., any error would be harmless because the jobs the ALJ concluded that [the p]laintiff could perform do not require significant social interactions. In fact, the [DOT's] descriptions of the jobs identified by the VE list interaction with "People" as being "Not Significant."), recommendation adopted, slip op. (M.D.N.C. Nov. 24, 2020) (Biggs, J.).

Case 1:21-cv-00972-WO-LPA   Document 25   Filed 03/02/23   Page 30 of 40

. . .

> The state mental health consultant at [the initial level
> of review] found [Plaintiff] had moderate limitations in
> all four paragraph "B" criteria and limited [him] to "at
> least simple instructions with additional social,
> concentrative, and adaptive limitations. This is
> reasonably consistent with the record, although the non-
> maximal language about simple instructions is unhelpful.

> The state mental health consultant at [the
> reconsideration level of review], on the other hand,
> found the impairments non-severe, basing the decision on
> the limited evidence before the date last insured. The
> difficulty with this is that consideration of the
> longitudinal record shows [Plaintiff] was seeing a
> therapist during the time and was then referred to a
> doctor for medication management. He had previously been
> incarcerated and in drug rehabilitation programs. Based
> on this evidence, the opinion that the impairments are
> non-severe is not persuasive.

(Tr. 22-24.) The ALJ's above-quoted analysis discussed <u>all</u> of the
mental health evidence in the record prior to Plaintiff's date last
insured of March 31, 2015, and adequately explained why the ALJ
included the limitations he did in the mental RFC.

    In sum, Plaintiff's second issue on review falls short.[12]

---

[12] Plaintiff's Brief contains two other cursory arguments – (1) that the
ALJ erred by "set[ting] out the RFC before getting to the explanation of the
basis for the RFC" in violation of <u>Mascio v. Colvin</u>, 780 F.3d 632 (4th Cir.
2015), and <u>Monroe v. Colvin</u>, 826 F.3d 176, 188 (4th Cir. 2016) (Docket Entry 14
at 27), and (2) that the limitations Plaintiff described in performing his daily
activities "would produce limitations in a normal work environment" and affect
"a full base of sedentary work" (<u>id.</u> at 28 (citing Tr. 51-52, 72)). With regard
to the first argument, as a matter of formatting and organizational structure,
ALJs (as did the ALJ here (<u>see</u> Tr. 21) typically express the RFC as a numbered
and bolded heading (as they do all of the findings they make at other steps of
the SEP), and then discuss the evidence that supports that RFC finding. <u>See</u>
<u>Sherah F. v. Berryhill</u>, No. 18CV957, 2019 WL 2642833, at *9 (D. Md. June 27,
2019) (unpublished) ("In th[e c]ourt's experience, ALJs will include their RFC
findings in the heading of the section of their decision discussing a claimant's
RFC. In the body of the discussion that follows, the ALJs will then discuss the
evidentiary support and reasoning behind their conclusion. When they do refer
to the RFC again in the discussion, it will usually be in general terms."). The
<u>Sherah F.</u> court found "unclear" whether the ALJ's mere placement of the RFC in

### 3. Full and Fair Hearing

Lastly, Plaintiff contends that "[t]he ALJ's refusal to allow [P]laintiff's counsel to complete argument and questioning of witnesses in the hearing resulted in an incomplete development of the record, and constituted an unfair and flawed hearing process." (Docket Entry 14 at 28 (underscoring and single-spacing omitted); see also Docket Entry 20 at 4-5.)  More specifically, Plaintiff points to the following comments by the ALJ during the hearing:

- "The ALJ had commented that his first hearing ran over and had technical problems.  He said [Plaintiff's] hearing started 26 minutes late but actually it started 46 minutes after the scheduled start time of 10:00." (Docket Entry 14 at 29 (referencing Tr. 39, 90).);

---

a heading preceding the supporting analysis constituted "'express[ing the] RFC first'" as prohibited by Monroe and its progeny.  Id. (citing Thomas v. Berryhill, 916 F.3d 307, 312 (4th Cir. 2019), in turn citing Monroe, 826 F.3d at 188).  The Court need not resolve that issue because, even assuming the ALJ here expressed the RFC before the supporting analysis, unlike in Monroe, the ALJ here did not then find the evidence "consistent" with that predetermined RFC. (See Tr. 21-24.)  The Monroe decision expressly relied on the Fourth Circuit's earlier decision in Mascio, wherein the Fourth Circuit found erroneous an ALJ's reliance on the "boilerplate" language that "the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms [we]re not credible to the extent they [we]re inconsistent with the above [RFC] assessment," holding that such language "gets things backwards by implying that" the ALJ first determined the RFC, and then used the RFC "to determine the claimant's credibility." Mascio, 780 F.3d at 639 (emphasis added).  The ALJ here, however, did not use that forbidden language in assessing Plaintiff's subjective symptom reporting (see Tr. 22 (finding that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [his] symptoms [we]re not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in th[e ALJ's] decision" (emphasis added))) and thus Plaintiff has not demonstrated error under Monroe, see Linares v. Colvin, Civ. No. 14-120, 2015 WL 4389533, at 86 (W.D.N.C. July 17, 2015) (unpublished) (finding language similar to phrasing used by ALJ here "distinguishable from the now suspect boilerplate language used in Mascio," because "the ALJ's language does not suggest that he first assessed [the p]laintiff's RFC and used that assessment to determine credibility").  Plaintiff's second cursory argument regarding his descriptions of daily activities lacks merit, because it relies on Plaintiff's subjective statements, which the ALJ discounted (see Tr. 21) in a finding unchallenged by Plaintiff (see Docket Entries 14, 20).

- "When the ALJ first allowed [Plaintiff's counsel] to question [Plaintiff, the ALJ] said 'please get [the parties] through as quickly as you can.'" (Id. (quoting Tr. 65).);

- "The ALJ stated while [Plaintiff's counsel] was questioning [Plaintiff], that '[counsel] need[ed] to wrap this up. [The hearing was] way past time . . . . [W]ay, way, way past time." (Id. (quoting Tr. 76).);

- "At 1 [hour], 26 minutes into the hearing, while [Plaintiff's counsel] was questioning the VE, the ALJ said [counsel] needed to move along faster, as the hearing had lasted almost 2 hours." (Id. (internal parenthetical citation omitted) (citing Tr. 90).);

- "At 1 [hour,] 27 min[utes, the ALJ] said 'Anything else?' The ALJ closed the hearing 1 hour 29 minutes 58 seconds into the hearing." (Id. (internal parenthetical citation omitted) (citing Tr. 93).)

Plaintiff asserts that, as a result of the ALJ's desire to conclude the hearing in a timely manner, his counsel could not (1) "question the VE in any detail about the jobs she had identified" (id.), (2) "call [Plaintiff]'s wife as a witness, or in the alternative[,] get a stipulation as to her testimony being corroborative of [Plaintiff]'s testimony" (id.), and (3) "discuss the significance of [the W]orker's [C]ompensation aspects of the case which it was apparent that the ALJ was overstating" (id. at 30). Although Plaintiff stresses that he "absolutely does not accuse the ALJ of prejudice, partiality, bias, misconduct or discrimination," he maintains that "the lack of opportunity to complete the record did result in unfairness." (Id. at 32.) For the reasons that follow,

Plaintiff's arguments do not establish that the ALJ failed in his duty to provide Plaintiff with a full and fair hearing.

Plaintiff has a right "to a full and fair hearing of [his] claim[]" before an ALJ, <u>Sims v. Harris</u>, 631 F.2d 26, 27 (4th Cir. 1980), and "the failure to have such a hearing may constitute good cause sufficient to remand to the [Commissioner] under 42 U.S.C. [§] 405(g) for the taking of additional evidence," <u>id.</u> Although that right includes the opportunity to cross-examine VEs, <u>see</u> 20 C.F.R. § 404.950(e), that right has limits, as "the conduct of the hearing rests generally in the [ALJ]'s discretion . . . so long as the procedures are fundamentally fair," <u>Richardson</u>, 402 U.S. at 400.

a. <u>Cross-Examining the VE</u>

Plaintiff asserts that, "[g]iven more time, [his counsel] could have covered with the VE some of the arguments [counsel] ha[d] made [] in th[e] [B]rief [in support of Plaintiff's instant Motion,] . . . [including] how limitations existing at the date last insured eroded the base of unskilled sedentary jobs, which the ALJ failed to do." (Docket Entry 14 at 30.) In Plaintiff's view, "[t]his is a very close case; it would be hard to conclude that additional testimony or argument could not have made a difference." (<u>Id.</u>) That argument fails to carry the day for two reasons.

First, the transcript of the hearing does <u>not</u> support Plaintiff's assertion that the ALJ prevented his counsel from

34

further cross-examination of the VE.  The record in fact reveals that Plaintiff's counsel cross-examined the VE about (1) the impact of a worker's need to walk away from the work station on the Document Preparer job (see Tr. 88), (2) the impact of a worker's need to lie down during a shift on the jobs identified by the VE (see id.), (3) the impact of the FCE's limitation to sitting, standing, and walking each for up to one-third of a workday on the identified jobs (see id.), (4) whether Plaintiff's prior work as a fast food worker could entail lifting more than 20 pounds (see Tr. 89), and (5) the impact of depression that occasionally interfered with concentration and memory on available jobs (see Tr. 90). During this course of questioning, Plaintiff's counsel spontaneously offered that "[she was] almost through" (id. (emphasis added)), and then responded "No, nothing else, Your Honor" when the ALJ asked if she had any further questions (id. (emphasis added)).  Under such circumstances, Plaintiff has not shown that the ALJ prevented his counsel from asking further questions of the VE.

Second, even assuming, arguendo, that the ALJ somehow curtailed Plaintiff's counsel's cross-examination of the VE, Plaintiff has not shown how that curtailment prejudiced him.  He offers only that, with more time, his counsel would have asked the VE about matters raised in Plaintiff's second issue on review regarding "how limitations existing at the date last insured eroded

35

the base of unskilled sedentary jobs." (Docket Entry 14 at 30.)
As explained in the discussion of that issue, however, those
assertions lack merit. Accordingly, Plaintiff has not shown how
the ALJ's allowance of more time to cross-examine the VE on those
meritless matters would have resulted in a more favorable outcome.
See Hyett v. Saul, No. 1:19CV216, 2021 WL 1156622, at *8 (N.D.W.
Va. Mar. 26, 2021) (unpublished) ("While [the plaintiff] had the
right to a full and fair hearing on his claim, including the right
to cross-examine the [VE], the ALJ retained discretion to limit a
repetitive and time-consuming examination. Despite the [VE]'s
previous testimony that the hypothetical person could perform the
identified occupations, [the plaintiff]'s attorney intended to
question the [VE] on [the plaintiff]'s ability to perform every
duty required by these occupations. As the magistrate judge
observed in the [recommendation], '[n]othing about the ALJ's
actions demonstrate anything but an effort to manage her caseload
and operations.'"); Kelly v. Saul, No. 4:18CV153, 2019 WL 3544071,
at *4 (E.D.N.C. Aug. 1, 2019) (unpublished) (rejecting the
plaintiff's claim that "ALJ improperly prevented [the plaintiff's]
representative from conducting a full cross-examination of the VE,"
because the plaintiff "d[id] not indicate . . . how she was
prejudiced by the limitations placed on the cross-examination").

b.  <u>Calling Plaintiff's Wife as a Witness</u>

Plaintiff next faults the ALJ for preventing his counsel from "call[ing Plaintiff]'s wife as a witness, or in the alternative[, ] get[ting] a stipulation as to her testimony being corroborative of [Plaintiff]'s testimony."  (Docket Entry 14 at 29.)  The following exchange between Plaintiff's counsel and the ALJ belies Plaintiff's arguments:

> ALJ:  Anything else for the hearing today?
>
> ATTY:  Well, we would contend the wife as a witness as I believe she would be corroborative.  I also –
>
> ALJ:  You should have told me that before [Plaintiff] testified.
>
> ATTY:  <u>I think it would be repetitive</u>.
>
> ALJ:  Not going to happen in this hearing.  Not if she's been sitting there listening to her husband testify.  I sequester all witnesses in every hearing.  If you were going to call her as a witness, you should have told me that at the start.
>
> ATTY:  Okay.
>
> ALJ:  I would have excluded her from the room.
>
> ATTY:  Okay, I'm sorry, Your Honor, most judges that I've dealt with prefer to have the person in the room so they –
>
> ALJ:  But, with two hours into it, we don't have time for more evidence.  I'm sorry.
>
> ATTY:  I understand, Your Honor.

(Tr. 90-91 (emphasis added).)

37

That colloquy defeats Plaintiff's contentions in four ways. First, contrary to Plaintiff's assertion (see Docket Entry 14 at 29), his counsel did not request a stipulation from the ALJ that Plaintiff's wife would corroborate Plaintiff's testimony. (See Tr. 90-91.) Second, Plaintiff fails to explain how such a stipulation, if granted, would have resulted in a more favorable outcome, given that the ALJ discounted Plaintiff's subjective symptom reporting (see Tr. 22), and that Plaintiff failed to challenge that finding (see Docket Entries 14, 20). Third, the ALJ properly could insist on the sequestration of witnesses during the hearing, see Hearings, Appeals, and Litigation Law Manual ("HALLEX"), § I-2-6-60 ("An ALJ may choose to exclude a witness from the hearing while others are testifying."), and Plaintiff's counsel's eleventh-hour request to call Plaintiff's wife as a witness deprived the ALJ of the ability to sequester Plaintiff's wife during Plaintiff's testimony, providing the ALJ with a legitimate basis to deny the request to call Plaintiff's wife. Fourth, HALLEX also makes clear that the ALJ may decline to allow testimony that qualifies as merely "repetitive or cumulative," id., providing an additional ground to support the ALJ's decision not to allow the testimony of Plaintiff's wife, which Plaintiff admitted "would be repetitive" (Tr. 91).

c.   Offering Arguments Regarding the Workers' Compensation Ratings

Lastly, Plaintiff maintains that his counsel "argued [in closing] that the [Workers' Compensation 10 percent permanent partial disability ratings offered by Dr. John Lee Graves on August 15, 2013 (see Tr. 509), and by Dr. Keeling on October 30, 2013 (see Tr. 535)] w[ere] misleading," and that counsel "believe[d] that [] the ALJ . . . was basing his views on the [W]orkers['] Compensation claim, that this was inappropriate, and that [she] was prevented from pointing th[at] out." (Docket Entry 14 at 29 (referencing Tr. 91-92).)  In particular, Plaintiff asserts that the ALJ "apparently felt that [Plaintiff's left knee] reached a level of severity appropriate for [total knee] replacement only [] after the [date last insured]," but Plaintiff believed "that [his left knee's] severity prior to the [date last insured] warranted knee replacement." (Id. at 31-32; see also id. at 31 (noting that "the rating guide for arthroplasty of the knee using prosthesis or cup (optimal results) equals 40%" (stray quotation mark omitted) (citing Tr. 493).)

Plaintiff's arguments ignore the fact that his counsel did have the opportunity to make that argument to the ALJ.  At the hearing, Plaintiff made the following closing argument to the ALJ:

> The only thing I would say, Your Honor, is I think that
> Workers' Comp rated it at ten percent is somewhat
> misleading because that particular doctor recommended
> knee surgery eventually and that would have automatically
> bumped that rating up a whole lot.  I just think those

39

Workers' Comp ratings are suggesting that the person has
more function than they have.

(Tr. 92-93 (emphasis added).) The ALJ did not interrupt
Plaintiff's counsel (see id.), and counsel herself indicated that
her remarks constituted the "only" thing she had to say (Tr. 92).[13]

In light of the foregoing discussion, Plaintiff has not
established that the ALJ breached his duty to provide Plaintiff
with a full and fair hearing and thus his third and final
assignment of error fails as a matter of law.

### III. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision
finding no disability be affirmed, that Plaintiff's Motion for
Judgment Reversing Commissioner (Docket Entry 15) be denied, that
Defendant's Motion for Judgment on the Pleadings (Docket Entry 18)
be granted, and that his action be dismissed with prejudice.


                              /s/ L. Patrick Auld
                          **L. Patrick Auld**
                    **United States Magistrate Judge**

March 2, 2023

---

[13] In a letter addressed to the ALJ dated May 6, 2021, the same date as the
hearing, Plaintiff's counsel thanked the ALJ for allowing counsel "additional
time" to discuss Plaintiff's case and thereafter offered an argument that
Plaintiff's need for a cane would eliminate the jobs identified by the VE. (Tr.
473.) Plaintiff's counsel emphasized that the cane argument constituted "the
point [she] was fishing for at the end [of the hearing] when [the parties] ran
into time constraints." (Id. (emphasis added).) Plaintiff's counsel made no
argument relating to Workers' Compensation ratings. (See id.)

40